**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Harry Orlando CLEMONS,**
**Defendant–Appellant.**

No. 99–6375.

United States Court of Appeals,
Sixth Circuit.

March 14, 2001.

Before BOGGS and MOORE, Circuit Judges, and BELL,* District Judge.

## OPINION

MOORE, Circuit Judge.

On August 27, 1999, a jury convicted Defendant–Appellant, Harry Orlando Clemons ("Clemons"), of two counts of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1) and one count of using or carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). Clemons now appeals his convictions, asserting that the evidence at trial was insufficient to support a guilty finding against him on all three counts. For the reasons that follow, we AFFIRM the district court's judgment.

## I. BACKGROUND

On December 28, 1995, Officer Jamie Russell and her partner witnessed a person driving a gray Cadillac at fifty miles per hour in a thirty-five mile per hour speed zone and proceeded to follow the speeding Cadillac until the driver, Clemons, halted at a stop light. Believing that Clemons had stopped for them, the officers exited their car and began walking toward Clemons; however, when the officers reached the front bumper of the Cadillac, Clemons sped off in the direction of oncoming traffic and led the officers on a high-speed car chase until he stopped and jumped out of the car.

The officers then pursued Clemons by foot. In the midst of this chase, Russell saw a police car pull up and stop near the site of the chase. Inside this police car was Officer Chris Line, who had responded to Russell's call for assistance. As Russell was chasing Clemons, Line exited his car, placed himself about twenty feet in front of Clemons, drew his firearm, and then ordered Clemons to stop. According to Line, as Clemons came to a halt, Clemons tossed an object out of his hand. Russell corroborated Line's testimony, also testifying that she saw Clemons throw an item to the ground as he complied with Line's order.

Line and Russell then arrested Clemons, secured him in a police car, and returned to the area where they both saw Clemons throw an item to the ground. In that area, Line and Russell found a bag of what they believed to be crack. Testing revealed that the bag contained 8.5 grams of crack.

---

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

At trial, Russell, who had served as a patrol officer for four years and who, at the time, had served as an officer in the Organized Crime Unit for three years, testified that crack was usually sold in small pieces or "rocks" – about two-tenths of a gram – and generally cost about twenty dollars a rock. She further testified that, based on her experience, possession of 8.5 grams of crack was not consistent with personal use; that users generally paid for their crack in cash; and that drug dealers often carry firearms to protect that cash. Celeste White, a chemist at the Tennessee Bureau of Investigation Crime Laboratory, testified that 8 .5 grams of crack is larger than the typical amount of crack brought to her lab for analysis "as single pieces of evidence." Joint Appendix ("J.A.") at 100.

On January 21, 1997, Clemons was arrested again by police officers. On that date, Officer Craig Anders was on duty in a marked police car when he received a radio call from two undercover officers, who had requested assistance in pulling over a white-over-blue Buick with three bullet holes on its side. Responding to this call, Anders began to look out for the Buick.

Anders finally spotted the Buick and followed the car. At the undercover officers' request. Anders later activated his emergency equipment to conduct a traffic stop. Instead of stopping, however, the driver of the Buick, Clemons, sped up and led Anders on a car chase. When Clemons finally stopped the Buick, one of the passengers in the car immediately fled, and Agent David Ridenour, one of the undercover officers, followed that passenger. Anders testified that Clemons then exited the car and "pitched a black object, which [Anders] believed to be a handgun, at that time back into the car." J.A. at 72. Agent Jason Legg, the other undercover officer at the stop, also testified to seeing Clemons throw a weapon to the floorboard of the Buick. Clemons testified that he did not throw a firearm through the window of the car as he exited and that he fled because his friend had dropped a firearm inside the car before escaping.

According to Anders, after Clemons threw the firearm into the Buick, Clemons then began to run away, and Anders pursued Clemons. Ridenour testified that, after he heard Legg say "David, he has a gun," he stopped his chase to help Anders pursue Clemons. J.A. at 130. Anders eventually followed Clemons through a residential neighborhood until Anders temporarily lost sight of Clemons around the corner of a house. At that time, Ridenour, who was behind Anders, cut across the front yard of the house in hopes of intercepting Clemons at the other end of the house. According to Ridenour, when Clemons emerged from behind the house, Clemons was walking. Ridenour testified that, at that time, he drew his weapon and ordered Clemons to stop. The next time that Anders saw Clemons, Clemons was on the ground pursuant to Ridenour's orders. Anders then secured Clemons in handcuffs, patted him down for weapons, and brought Clemons to his police car.

Thereafter, Anders placed Clemons in his police car and went back to look for the item he saw Clemons throw back into the Buick. Inside the Buick, Anders found a loaded 9–mm handgun on the floorboard of the vehicle. Anders testified that he was sure that the firearm was the object he saw Clemons throw back into the Buick.

Anders then followed Ridenour, who had decided to check the area behind the house where Clemons was arrested. At the house, Ridenour showed Anders a bag of crack that he found hidden in a "downspout coming from the gutter system." J.A. at 77. Testing revealed that the bag contained 6.8 grams of crack. Thereafter,

Anders and Legg more thoroughly searched Clemons at the police car. As a result of this search, the officers found a motel key in the Clemons's waistband and a roll of money amounting to $2,420 in Clemons's groin area. Although Clemons testified to working part-time construction in January 1997, he made only $700 from January 1–21, 1997.

## II. ANALYSIS

The standard of review for claims of insufficient evidence is whether " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. White*, 932 F.2d 588, 589 (6th Cir.1991) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Circumstantial evidence alone is sufficient to sustain a conviction, and the jury need not "remove every reasonable hypothesis except that of guilt." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir.), *cert. denied*, 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991) (internal quotation omitted).

### A. Count One

Clemons argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he was guilty of possessing crack with the intent to distribute on December 28, 1995, in violation of 21 U.S.C. § 841(a)(1). Section 841(a)(1) provides that it is unlawful for any person knowingly or intentionally to "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). To establish a violation of § 841(a)(1), the Government must prove the following elements: "(1) knowing (2) possession of a controlled substance (3) with intent to distribute."

*United States v. Christian*, 786 F.2d 203, 210 (6th Cir.1986). Intent to distribute drugs may be inferred solely from circumstantial evidence of possession of large quantities of drugs. *White*, 932 F.2d at 590.

We conclude that the trial evidence regarding events occurring on December 28, 1995 provided a sufficient basis to support a guilty finding of possession of crack with intent to distribute beyond a reasonable doubt. Viewing all of the evidence in a light most favorable to the Government, we believe that a rational jury could have concluded that Clemons fled because he had crack in his possession, *see Illinois v. Wardlow*, 528 U.S. 119, 124–25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (noting that flight may be indicative of ongoing criminal activity); that Clemons had thrown the 8.5 grams of crack to the ground; that the amount of crack in the bag was large enough to support an inference of intent to distribute, and that Clemons had the cocaine in his possession with an intent to distribute it.

### B. Count Two

We also conclude that the trial evidence regarding events occurring on January 21, 1997 provided a sufficient basis to support a guilty finding of possession with intent to distribute crack beyond a reasonable doubt. Viewing the evidence in a light most favorable to the Government, we believe that a rational jury could have concluded that Clemons fled from the officers because he knew he had crack in his possession; that Clemons hid the 6.8 grams of crack found in the downspout; that Clemons was walking when he came from behind the house where he was arrested because he had disposed of the drugs on his person; that the amount of crack in the bag was large enough to draw an inference of intent to distribute; that

the $2,420 found in Clemons's groin area constituted proceeds from Clemons's drug dealing; and that Clemons used the 9–mm firearm to protect the cash he earned from drug dealing. *See United States v. Wilson*, 27 F.3d 1126, 1133 (6th Cir.), *cert. denied*, 513 U.S. 976, 115 S.Ct. 452, 130 L.Ed.2d 361 (1994) (recognizing that firearms are " 'tools of the drug trafficking trade' ") (citation omitted).

### C. Count Three

■ We further conclude that the trial evidence provided a sufficient basis for a rational jury to find that Clemons carried a firearm during and in relation to his drug trafficking offense on January 21, 1997. Section 924(c)(1) provides that "[w]hoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...." 18 U.S.C. § 924(c)(1) (1997). To prove a violation of § 924(c)(1), the Government must prove: (1) that the defendant knowingly used or carried a firearm; and (2) that the use or carrying was during and in relation to a drug trafficking crime. *Smith v. United States*, 508 U.S. 223, 227–28, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993).

In *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), the Supreme Court "clarified the contours of the term 'carry' as it is to be interpreted under § 924(c)(1)." *Hilliard v. United States*, 157 F.3d 444, 449 (6th Cir.1998). In so doing, the Supreme Court rejected the "firearms on the person" or immediate accessibility requirements as they applied to the carrying of a firearm in a car and held that § 924(c)(1) "also applies to a person who knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies." *Muscarello*, 524 U.S. at 126–127, 118 S.Ct. 1911. In addition to clarifying the meaning of the term "carry," the Supreme Court has also explained the phrase "during and in relation to" a drug trafficking crime, noting that the use or carrying of "the firearm must have some purpose or effect with respect to the drug trafficking crime" to satisfy the "during and in relation to" prong. *Smith*, 508 U.S. at 238, 113 S.Ct. 2050. In other words, the firearm must facilitate or further, or have the potential of facilitating or furthering, the drug crime, and "its presence or involvement cannot be the result of accident or coincidence." *Smith*, 508 U.S. at 238, 113 S.Ct. 2050.

■ Viewing all of the previously mentioned evidence in a light most favorable to the Government, specifically the testimony of Anders and Legg, a rational jury could have found that Clemons had the firearm on his person, that he threw the firearm into the Buick, and therefore that he "carried" the firearm within the meaning of § 924(c)(1). A rational jury also could have concluded that Clemons was a drug dealer and that Clemons carried a gun to protect the cash he received from drug dealing, in particular the cash found in his groin area, and therefore that he carried the firearm "during and in relation to" his drug trafficking crime. In sum, the evidence at trial was sufficient to support a jury finding that the Government satisfied both requirements under § 924(c)(1). *See, e.g., United States v. McRae*, 156 F.3d 708, 712 (6th Cir.1998) (holding that "evidence that [the defendant] had the rifle and drugs together and close enough to grab when the police entered the premises" supported a finding that the rifle was carried

during and in relation to a drug trafficking offense).

## III. CONCLUSION

For the reasons stated above, we AFFIRM the district's court judgment in this case.